Filed 5/21/26  In re S.P. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re S.P., a Person Coming Under the Juvenile Court Law. | B346869 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 24CCJP03064 |
| Plaintiff and Respondent, | |
| v. | |
| V.D., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Tara Newman, Judge.  Affirmed.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Mother challenges the juvenile court's jurisdiction and disposition findings and orders sustaining a subsequent petition under section 342 of the Welfare and Institutions Code[1] as to her child S.P., removing S.P. from her custody, and denying her reunification services under sections 361.5, subdivisions (b)(10) and (11).  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case concerns mother's and father's child S.P. (born December 2023).  Father is not a party to this appeal.  Before S.P.'s birth, mother had four children with G.D.—J.D., R.D., A.D., and E.D.  In February 2017, the juvenile court sustained a section 300 petition on J.D.'s and R.D.'s behalf alleging G.D. and mother had a history of engaging in violent altercations in the children's presence.[2]  J.D. and R.D. initially were released to mother but in May 2018 were detained because mother had allowed G.D. to have unlimited access to at least one of the children.  In July 2018, the court granted mother reunification services.  Also in July 2018, the court sustained a section 300 petition on A.D.'s behalf based on mother having allowed G.D. to have unlimited access to A.D. and the allegations sustained as to J.D. and R.D.  And in August 2019, the court sustained

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] G.D. pushed mother while she was pregnant with R.D. He was arrested.  The sustained petition also alleged G.D. had a history of drug use, had been convicted of possession of a controlled substance, was a current user of methamphetamine, was a registered sex offender, and had mental and emotional problems.  The court found mother failed to protect the children.

a section 300 petition on baby E.D.'s behalf based on his siblings' dependency cases. The court terminated mother's reunification services for E.D. in July 2019 and for J.D., R.D., and A.D. in August 2019. In August 2022, parental rights were terminated for mother and G.D. as to the four children.

On September 24, 2024, then-nine-month-old S.P. came to DCFS's attention. Deputies had stopped a car—that had been reported as stolen—after it ran a red light. Mother—a passenger in the vehicle—had an outstanding warrant for a probation violation.[3] Mother resisted arrest and had to be restrained forcibly. S.P., who was in a car seat inside the vehicle, was taken into protective custody.[4] A DCFS social worker interviewed mother in jail. Mother said she didn't know the car was stolen. She had become emotional when she realized she was being arrested. Mother said she and father were a couple but did not live together.

On September 26, 2024, DCFS filed a petition under section 300, subdivision (b)(1) on S.P.'s behalf. The petition alleged that, on September 24, 2024, mother endangered S.P. by riding with her in a stolen car driven by an acquaintance, who ran a red light, and that mother was "arrested on an

---

[3] Mother was convicted of vehicle theft in 2018 and 2021 and shoplifting in 2021.

[4] According to the police report, mother and S.P.—in a forward-facing car seat—were in the back seat of the stopped car. Mother refused to follow the deputy's commands but then got out of the car holding S.P. Mother also refused to comply with the arrest team's orders, who had to use physical force—while mother was holding the child—to arrest her.

3

outstanding probation violation and incarcerated for Child Abuse With Possible Great Bodily Injury/Death, Battery On Person, Obstruct/ETC Public Officer." At the detention hearing, the juvenile court ordered S.P. detained from both parents—mother was incarcerated and father's whereabouts were unknown. The court continued the arraignment to October 8.

Father appeared at the arraignment and the court appointed counsel. The parentage statement he filed said he believed he was S.P.'s father and that S.P. had lived with him since her birth. The court ordered S.P. to remain detained until DCFS could speak with father. The court again continued the arraignment.

The dependency investigator (DI) interviewed father. He said mother had told him she wanted "to work on fixing their relationship and to get their daughter back." Mother and S.P. had been staying with father at his grandparents' house and with mother's family. Father denied any domestic violence with mother. He said they got into arguments but there was no physical violence. He wanted to have mother in his life but didn't know if they still had a relationship. Father admitted having been "arrested for all types of stuff, including drugs and guns." He admitted he had a history of substance abuse and last had used methamphetamine "a couple of days ago." Father also admitted his grandparents had a restraining order against him that he had violated. They called law enforcement because he was using drugs again. He was arrested and released. Father also stated he had been diagnosed with "Bi-Polar and Schizophrenia" and wanted to enroll in mental health treatment.

Father's grandfather—paternal great-grandfather (PGGF)—told the DI he had kicked father out of his house three years earlier because of his drug use. PGGF said father was staying with him now, but he would "have to kick him out" if he didn't go to treatment due to the restraining order. He told the DI he had seen mother. She and father "argued too much" when she came to PGGF's house. About a month earlier, when parents "were arguing and fighting," PGGF told mother he didn't want her there and would call the police. He hadn't seen mother since. PGGF told the DI that parents "did not throw punches, but they were really close." DCFS recommended the court not release S.P. to father.

On October 24, 2024, DCFS filed a first amended petition, adding these details to the b-1 count about the September 24 incident:

> "The mother placed the nine month old child in a forward-facing car seat (violation of 27360 CVC). The mother resisted, delayed, and obstructed the orders of law enforcement during a stolen vehicle investigation while holding the nine month old child, with the knowledge of an outstanding arrest warrant. The mother's disregard to comply with law enforcement during the detention resulted in the physical takedown of the mother, which could have seriously injured the child who mother was holding just prior to the takedown. The mother was riding in a stolen vehicle despite being on active probation for vehicle theft."

The amended petition also added a b-2 count against father and mother alleging father had a "history of substance abuse including methamphetamine and marijuana," was a current

5

abuser of methamphetamine, had a positive toxicology screen for methamphetamine on October 8, 2024, and an extensive criminal history—including convictions for possession, and use, of a controlled substance; and mother "knew or reasonably should have known of the father's illicit drug use and failed to protect the child by allowing the father to reside in the child's home and have unlimited access to the child."[5] The next day, the court arraigned parents on the first amended petition and ordered monitored visitation.

On October 31, 2024, DCFS filed its jurisdiction/disposition report. S.P. was in a foster home. On October 21, parents had a monitored visit with S.P. at the DCFS office. Mother "appeared to be appropriate, engaged, and she read books to the child." Mother had been incarcerated from September 24 through October 19 for two different criminal cases: a violation of her probation for grand theft auto and for petty theft. In her interview with the DI, mother said her friend received a ticket for a stolen license plate—the car wasn't stolen. She also said S.P. wasn't in a front-facing car seat. Mother was willing "to do anything" to get her daughter back. She told the DI she'd enroll in parenting and individual counseling. Mother stated she knew of father's substance abuse history but didn't know he currently was using. She denied any domestic violence with father and said their relationship was "good." They had been together since mother's release but were not living together. Mother's support system included maternal grandmother and father. Parents had yet to participate in any services to address case issues.

---

[5] The amended petition also included a b-3 count relating to father's "mental and emotional problems."

6

On October 21, father tested positive for methamphetamine and oxycodone; mother tested negative for all substances. DCFS recommended reunification services for mother and father.

On November 20 and December 4, DCFS updated the court with last minute information for the court reports (LMIs). Parents were having three-hour visits with S.P. on Thursdays and Fridays at the DCFS office. The caregivers monitored the visits. Parents missed the visit scheduled for November 8 —mother said she was sick. Mother ended her visit early on November 21 and cancelled her November 22 visit. At an earlier visit, parents got into an argument and the security guard "had to intervene." Mother said she was participating in parenting classes but had not provided proof of enrollment.[6] Father was a "no show" for his November 7 and 22 drug tests. Mother missed her November 21 drug test.

On December 6, 2024, the court sustained the amended petition's b-1 and b-2 counts as to both parents and dismissed the b-3 count. The court declared S.P. a dependent and removed her from father. The court released S.P. to mother over DCFS's and minor's counsel's objections. The court stayed the order until December 12 to allow DCFS to assess mother's new address at maternal grandmother's home. Mother's case plan included participation in developmentally appropriate parenting classes, individual counseling to address case issues and "underlying needs and healthy relationships," and submission to three weekly random and on-demand drug/alcohol tests. The court ordered

---

[6]    At the adjudication hearing, mother submitted a November 21, 2024 letter stating she had enrolled in a parenting course on October 28, 2024.

7

mother not to monitor father's visits or to allow father to have contact with S.P. "outside of DCFS-approved visits."

On December 20, 2024, mother was arrested for domestic violence outside of paternal grandmother's home where father was staying. According to the incident report, paternal grandmother told the responding sheriff's deputy that she heard yelling coming from outside in front of her house. She went outside and saw father and mother "punching each other in the middle of the street." Paternal uncle Noah also said he saw parents punching each other "multiple times." Paternal grandmother stated that, after Noah went inside to call 911, mother "produced" a small folding knife "from her person." Father fled the scene. Mother yelled profanities at paternal grandmother "and approached her with the knife in her right hand readily available in the open and locked position." Paternal grandmother was afraid she'd be assaulted and ran inside. When law enforcement arrived, a deputy found the knife in mother's right hand. It was folded and in the closed position. Paternal grandmother identified the knife as the one mother had used.

Mother told the reporting deputy that she had gone to the home to drop off father's belongings. As mother was talking to paternal uncle Christian on the driveway, father came out of the house as if to hug her. Instead, he wrapped his arms around her and tackled her to the ground. Mother said father fled. She denied she and father punched each other. She also denied ever having "used the knife as a weapon" and accused paternal grandmother of lying. Mother initially stated she was uninjured but later complained of back and abdominal pain

(and falsely claimed she was pregnant). She was taken to the hospital and medically cleared for booking.

According to the deputy who made the report to the child protection hotline, mother reported that, during the altercation, maternal grandmother was in her car across the street with S.P. Maternal grandmother allegedly fled the scene, and mother refused to provide any information about her or S.P. On December 23, 2024, DCFS notified maternal grandmother that she was to bring S.P. to the DCFS office. DCFS took custody of the child, who appeared well-cared for. Maternal grandmother confirmed mother had gone to father's location to drop off his belongings, and parents had gotten into an altercation. She denied having been at the scene, however. Maternal grandmother said she "had been keeping" S.P. at a relative's house in the Los Angeles area since the incident.

On December 26, 2024, DCFS filed a subsequent petition under section 342, alleging—under section 300, subdivisions (a) (b), and (j)—parents engaged in a violent altercation on December 20 where father tackled mother to the ground; parents repeatedly struck each other with closed fists; mother brandished a knife at father and approached paternal grandmother with a knife; and mother was arrested under Penal Code sections 273.5, subdivision (a) (domestic violence), 245, subdivision (a)(1) (assault with a deadly weapon), and 422, subdivision (a) (criminal threats). The petition also alleged S.P.'s half-siblings were dependents of the juvenile court and receiving permanent placement services "due to the mother engaging in violent altercations with a male companion and the mother failing to protect the siblings." The court detained S.P. from parents.

9

On February 7, 2025, DCFS filed its jurisdiction report in support of the section 342 petition. Mother stated the charges stemming from her arrest had been dropped. She denied the petition's allegations. Mother said maternal grandmother had dropped her off down the street from father's home. Maternal grandmother said she dropped mother off at the bus stop. Mother was supposed to call her when she was ready to be picked up. Paternal grandmother changed her story. She told the DI parents were arguing but were not hitting each other. She denied mother "brandish[ed] a knife at her," but said " 'she had one in her pocket.' " Father also denied he and mother were hitting each other. He agreed he probably was under the influence at the time, however. When asked if S.P. was there during the incident, father said, " '[N]o, but maybe she was in the car.' " He denied seeing S.P. and said he didn't know if maternal grandmother was in the car with S.P. The social worker reported father "eluded [*sic*] to [S.P.] being in the car." Father also admitted that, the day before the incident, he had held S.P. all night at maternal grandmother's home with mother. Father said he and mother weren't "together," but he was " 'working on it.' " Father had not started his case plan.

Mother visited S.P. on January 27, 28, 29, and February 5, 2025. She was a no-show for her February 3 visit and cancelled her February 4 visit. The social worker stated there were issues with mother's visits. She "was spending a majority of her time laying [*sic*] on the sofa and arriving at the last minute of the grace period." Mother missed drug testing on December 6 and 20, 2024 and on January 9 and 24, 2025. According to a March 7 LMI, on February 27—during an in-person meeting—mother told the social worker she had started classes but did not provide

10

documentation.  The DI tried calling and texting mother on March 6, but mother did not respond.

DCFS recommended mother receive no family reunification services based on section 361.5, subdivision (b)(10)—because the court previously terminated her services and she had "not made reasonable efforts to treat the problems that brought [S.P.] to the court's attention"—and section 361.5, subdivision (b)(11) —because her parental rights were terminated as to S.P.'s half-siblings.

On March 11, 2025, the court held the jurisdiction hearing on the section 342 petition.  The court admitted DCFS's reports and took judicial notice of the court's earlier orders and findings in the current case and S.P.'s half-siblings' cases.  The court also admitted mother's exhibits:  (a) a December 27, 2024 letter stating the District Attorney's office declined to file charges against mother based on her December 20, 2024 arrest; (b) a March 4, 2025 letter from mother's parenting teacher stating she had enrolled in a parenting course on October 22, 2024, and had completed 17 of the 20 units required for a certificate of completion; and (c) an enrollment verification letter stating mother had enrolled in an anger management class on February 25, 2025.[7]

S.P.'s counsel joined DCFS's counsel in asking the court to sustain the petition as pled.  Counsel noted that, by mother's own statement that maternal grandmother had dropped her off at father's home, S.P. was present during the parents'

---

[7]     The court noted exhibits (b) and (c) had not been authenticated and it would give them due weight with that understanding.

altercation. Mother's counsel argued DCFS had not shown "that this was anything other than a one-off incident," and had provided no evidence that S.P. was "in the zone of danger." Counsel noted both mother and paternal grandmother suspected father was having a mental health crisis. She believed there was no risk of an incident like that happening again. Counsel noted mother had no intention of reconciling with father, did not live with him, and had seen him only twice "in the past couple of months." Counsel argued DCFS had not proved mother's actions put S.P. at risk, "especially considering that the minor wasn't present." DCFS's counsel argued mother's statements were not credible—that it was clear she and maternal grandmother went to father's home. Counsel also noted father spent the night with mother and S.P. in violation of the court's order releasing S.P. to mother. Counsel argued that, "given mother's history of violence and violent behavior, I do think there's significant reason to believe that this would reoccur as mother has no qualms about violating the court's order to stay away from the father, to . . . ensure father was not present [with the child]."

The court found DCFS had shown "the violent conduct by the parents does pose a risk to [S.P.'s] physical health and safety, creating a detrimental home environment and putting her at risk." The court noted "parents were engaged in a very violent altercation outside of the paternal relatives' home." The court found "the statements that mother brandished a knife to be credible." The court again stated it "believe[d] that the parents' violent altercation and conduct does endanger [S.P.'s] physical health and safety." The court sustained the b-1 count of the subsequent petition, amended by interlineation to delete the allegation that mother had been arrested. The court dismissed

12

the a-1 and j-1 counts. The court set a contested disposition hearing to rule on DCFS's request to bypass reunification services for mother.

In an LMI filed April 8, 2025, DCFS reported the DI had confirmed with mother's parenting teacher that mother had completed the " 'Skillful Parenting Infant/Toddler' " course. Mother completed 105 hours, including lessons and assignments. The teacher told the DI she had given mother a certificate and letter of completion on April 7. Mother had not provided any of that information to DCFS. In an April 9 LMI, DCFS reported it received confirmation that mother had registered for a four-hour anger management course on March 11, 2025—not February 25 as noted in the enrollment letter—but had not started the sessions. DCFS also noted mother was inconsistent with visits and did not call when unable to make a scheduled visit. Mother missed three visits and was late for two visits between January 26 and April 9, 2025. On March 29, mother and maternal grandmother visited S.P. at the library, monitored by the caregiver. Mother became very hostile toward maternal grandmother, raised her voice, and called her " 'stupid.' " Due to that incident, DCFS decided visits would take place only at the DCFS office. Mother also had missed her drug tests.

At the April 10 disposition hearing, mother submitted the following exhibits: (a) an April 7, 2025 letter stating she had received "excellent test scores" in her parenting class, and (b) the certificate of completion for the parenting class; (c) an April 9 letter certifying mother had enrolled in therapy on March 13; and (d) an April 7 letter confirming mother had enrolled in a domestic violence education class on March 12, 2025. The court admitted the exhibits, giving due weight to unauthenticated exhibits (c)

13

and (d).  The court also admitted DCFS's reports and took judicial notice of the sustained petitions, case plans, and files for the related cases.

Counsel for DCFS argued mother had not made reasonable efforts to address the issues that led to the termination of her parental rights of S.P.'s half-siblings.  Counsel argued mother's recent efforts—the completion of only a parenting class, enrollment in an anger management class without having begun any sessions, and her recent enrollment in a domestic violence program and individual counseling without having made any progress—did not demonstrate reasonable efforts "to address the domestic violence issues and her inability to appropriately supervise the children."  Counsel noted mother had violated court orders by allowing G.D. to have unmonitored contact with J.D. and R.D. and had done something similar in this case with father.  Mother's counsel argued she had made reasonable efforts to treat those issues, and to focus on "sufficient progress" would constitute error.  Counsel argued mother's efforts "hardly [could] be characterized as lackadaisical or half-hearted."  Counsel argued that, "[j]ust because there's a new petition at this time with new allegations does not mean she's not making the efforts."

S.P.'s counsel also asked the court to bypass mother's reunification services.  Counsel noted the issues in the half-siblings' cases were "about violent altercations between the mother and her partner" and there had been "multiple violent altercations between the mother and the father in this matter."  Counsel argued completion of a parenting course did not constitute reasonable efforts "towards addressing the issues that put her before the court."  Counsel for DCFS argued "reasonable efforts" does not mean "any efforts at all," and here mother

14

had "made very minimal efforts." Counsel also argued mother had not shown it was in "the best interest of the child to reunify." Counsel noted mother had minimal participation in her programs, had not appeared for drug testing since October, and her visitation had been sporadic. Mother's counsel responded that the statute "does not include a standard or requirement for how much progress is made," and mother was "clearly far beyond a point where she is not showing any effort at all."

The court ordered S.P. to remain detained from parents and suitably placed, as remaining in the home of parents would pose a substantial danger to her safety, protection, and physical and emotional well-being. The court noted mother completed a parenting course, but the fact the course "was ongoing at the time of the removal and the recent incident[ ] demonstrate[ed] that mother was still lacking insight with regard to the violence." The court also noted mother had enrolled in domestic violence and individual therapy, but as she'd just begun those courses, that evidence did not demonstrate "a reasonable effort to address the issue, given how far along we are in this case and when the case plan was initially ordered." The court also found continuing services for mother would not be in S.P.'s best interest. The court ordered no family reunification services for mother under section 361.5, subdivisions (b)(10) and (11). The court found "there has not been a showing of reasonable efforts to address the problem that led to the removal of the half-siblings." The court allowed mother to have monitored visits with S.P.

## DISCUSSION

Mother challenges the juvenile court's jurisdictional findings sustaining the section 342 petition, the court's order

15

removing S.P. from her care, and the court's order bypassing her reunification services.

**1.** ***The court's orders sustaining the section 342 petition and removing S.P. were proper***

a. *Applicable law and standard of review*

When a child already has been declared a juvenile dependent, a subsequent petition is filed under section 342 when "new facts or circumstances, other than those under which the original petition was sustained, [arise] sufficient to state that the minor is a person described in Section 300." (§ 342, subd. (a).) A child comes within the jurisdiction of the juvenile court under subdivision (b)(1) of section 300 if, as relevant here, "there is a substantial risk that the child will suffer, serious physical harm or illness," as a result of the failure or inability of the child's parent adequately to supervise or protect the child. (§ 300, subd. (b)(1)(A).) A jurisdictional finding under section 300, subdivision (b)(1) requires the Department to prove: "(1) the parent's . . . neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601 (*Cole L.*).)

The statute permits jurisdiction under this subdivision "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (§ 300, subd. (b)(3).) Thus, "[t]he relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing ' "subject the minor to the defined risk of harm." ' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 411 (*L.B.*).) The juvenile court need not wait for the child actually to be abused or neglected before it can assume jurisdiction. (*In re I.J.* (2013) 56 Cal.4th

16

766, 773 (*I.J.*).)  "The court may consider past events in deciding whether a child presently needs the court's protection.  [Citations.]  A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Cole L.*, *supra*, 70 Cal.App.5th at p. 602.)  In other words, the Department "must establish a nexus between the parent's past conduct and the current risk of harm."  (*In re J.N.* (2021) 62 Cal.App.5th 767, 775.)

Under section 361, subdivision (c)(1), the juvenile court may not take a dependent child from the custody of the parent with whom the child was residing at the time the petition was filed "unless the juvenile court finds [by] clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633; *I.J., supra*, 56 Cal.4th at p. 773.)  Inferences that are the result of speculation or conjecture, however, are insufficient to support a jurisdictional finding.  (*In re B.D.*

17

(2024) 103 Cal.App.5th 315, 324.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012 (*O.B.*) [in conducting this type of review, court still must view the record in the light most favorable to the prevailing party, and "give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence"].) " 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.' " (*L.B., supra*, 88 Cal.App.5th at p. 412.)

b.     *Substantial evidence supports the court's finding that S.P. was at substantial risk of future harm*

Mother contends there was "no substantial evidence of any 'nexus' between the parents' <u>single</u> incident of physical altercation and a substantial risk of serious physical injury to S.P." We disagree. Substantial evidence supported the juvenile court's finding that mother's conduct placed S.P. at a substantial risk of harm. As mother asserts, there had been no prior reports of domestic violence between parents. Yet the evidence showed parents almost came to blows not long before DCFS became involved with S.P. Indeed, the situation was serious enough for PGGF to have threatened to call the police unless mother left. And during a joint monitored visit with S.P., parents argued to the point that a DCFS security guard had to intervene. The court thus reasonably could conclude that the December 20, 2024 incident was not a "one off" as mother's counsel described, but

18

an escalation of parents' behavior.  And substantial evidence supported the court's finding that parents' altercation on December 20 indeed was violent.

The court found credible the witness statements made to law enforcement at the scene describing parents as having punched each other "multiple times."  Although paternal grandmother later changed her story, the juvenile court reasonably could infer her initial statements to law enforcement were correct.  The court also found credible paternal grandmother's initial statement that mother had brandished a knife during the incident.  Law enforcement found a knife in mother's hand, and paternal grandmother identified it as the knife with which mother had approached her.  Thus, mother not only actively engaged in the violent altercation; she chose to bring a knife to the encounter—seemingly anticipating violence—and even approached paternal grandmother with it in a threatening manner.  Reasonably, mother's own actions during the altercation demonstrated S.P. was at risk of future harm, especially considering mother had endangered S.P. just a few months earlier when she resisted arrest while holding her.

Mother nevertheless contends that, as there was no evidence parents fought in S.P.'s presence, any risk to S.P. was minimal.  (Citing *In re S.F.* (2023) 91 Cal.App.5th 696, 715 [incidents of tussling without physical injury outside presence of minor insufficient to support jurisdiction], relying on *Cole L., supra,* 70 Cal.App.5th at p. 606 [physical danger to minors minimal where incident involved parents' pushing and grabbing for a phone outside minors' presence].)  As the court found, S.P. was not within the "zone of danger" of parents' violent altercation.  But that finding did not preclude the court from

19

also finding "parents' violent altercation and conduct" posed a risk to S.P.'s safety under section 300, subdivision (b). The court noted DCFS's report stated S.P. was in maternal grandmother's car across the street. We can infer the court found credible the deputy's report to the child protection hotline that mother had said maternal grandmother was across the street in her vehicle with S.P. Father also had alluded to S.P. being "in the car."[8] The court reasonably could have concluded maternal grandmother dropped off mother at or near father's location and then—at least until law enforcement arrived—waited with S.P. across the street. The fact that mother had maternal grandmother drive her—with a knife—to father's location and wait for her with S.P.—rather than, for example, asking maternal grandmother to drop off father's belongings for her— demonstrated mother was not putting S.P.'s safety first.

Moreover, the evidence supported the court's implied finding that the violent conduct could recur. Mother took no responsibility for her involvement in the altercation, denying she and father hit each other or that she brandished a knife. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197; see also *In re A.F.* (2016) 3 Cal.App.5th 283, 293 [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' "].) Father also denied he and mother were " ' hitting each other' "

---

[8] Once maternal grandmother finally returned S.P. to DCFS after the altercation, she denied having been at the scene of the incident. Yet she knew parents had been in an altercation and that mother had been arrested. We can infer the juvenile court did not credit maternal grandmother's denial.

and admitted he likely was under the influence. The court also reasonably could conclude parents' relationship would continue. Mother identified father—along with maternal grandmother—as her support system. Critically, she had allowed father to stay with S.P. all night despite the court's order barring her from giving him access to S.P. and her knowledge—from S.P.'s case—that he continued to use illicit drugs. Mother similarly had given G.D. access to S.P.'s half-siblings and remained in a relationship with him.[9] We thus reject mother's contention that her past dependency history was irrelevant to the question of S.P.'s future risk of harm because it involved G.D.'s violence *against her*.

Mother cites *In re Daisy H.* (2011) 192 Cal.App.4th 713, disapproved of on another ground in *In re D.P.* (2023) 14 Cal.5th 266, 278. That case is distinguishable. There, the parents' domestic violence had taken place two to seven years before a dependency petition was filed on behalf of their children. The court found it insufficient to prove the children were at a substantial risk of harm. There was no evidence of ongoing violence between parents, the children had not been present, and parents had since separated. (*Daisy H.*, at p. 717.) Here, parents had maintained a relationship and recently had engaged in aggressive behavior before their altercation—almost coming to blows at PGGF's home and requiring a security guard's

---

[9] Mother's and G.D.'s child E.D. was born in June 2019 —more than two years after J.D. and R.D. were declared dependents and about a year after they were detained from mother and then found to have been endangered by mother having allowed G.D. to have access to the children in violation of the court's order. Their child A.D. (born January 2018) also was declared a dependent almost a year before E.D. was born.

intervention during an argument. In short, parents' conduct had escalated. Mother's lack of insight into how her conduct put S.P. at risk, and her poor judgment, also supported the court's decision that S.P. was at substantial risk of future harm.

Given mother's own violent conduct and parents' continuing relationship, S.P. did not have to witness parents' violent altercation for the court to conclude that incident, along with the evidence of mother's past conduct, put S.P. at substantial risk of harm. (See, e.g., *In re E.B.* (2010) 184 Cal.App.4th 568, 576 [" 'Studies show that violence by one parent against another harms children even if they do not witness it.' "], disapproved of on another ground in *O.B.*, *supra*, 9 Cal.5th at p. 1003, fn. 4.) Accordingly, the evidence supported an implied finding that parents likely would reengage in violent conduct and the court's finding that S.P.—only 15 months old as of the March 11, 2025 adjudication hearing—was at substantial risk of physical harm.

c.       *Substantial evidence supports the court's order removing S.P. from mother's custody*

Substantial evidence supported the juvenile court's finding by clear and convincing evidence that S.P. would be at substantial risk of harm in mother's custody. Again, not only did mother engage in a violent altercation with father, but she also allowed him to have unrestricted access to S.P. in violation of the juvenile court's order. Mother had lost custody of S.P.'s half-siblings when she similarly violated the court's order and allowed their father G.D. to have contact with their children. Mother argues there is no evidence that she allowed father to have contact with S.P. outside of DCFS-approved visits, but father admitted he had held S.P. all night at mother's residence with

22

maternal grandmother.  Moreover, father was abusing drugs. He admitted he likely was under the influence during parents' altercation—the day after mother allowed him to stay the night with S.P.  And, again, mother demonstrated she lacked insight as to how her continued relationship with father put S.P. at risk.

We also reject mother's argument that the evidence did not support a finding by clear and convincing evidence that there were no reasonable means to protect S.P. other than removing her from mother's custody.  Mother let father have unlimited access to S.P. at her home—and engaged in the altercation with father—only two weeks after the court had ordered S.P.'s release to mother on the condition mother was "not to allow father to have contact with the child."  As mother also had failed to abide by the court's similar order in S.P.'s half-siblings' cases—and had named father as part of her support system—the court reasonably could conclude removal was necessary to protect S.P. In sum, the record convinces us that a reasonable factfinder could have found it highly probable that S.P. was at substantial risk of harm if left in mother's custody.

2.    ***The court did not err in bypassing mother's reunification services***

a.    *Applicable law and standard of review*

Under section 361.5, subdivisions (b)(10) and (b)(11), reunification services need not be provided to a parent if the juvenile court finds by clear and convincing evidence that either "the court ordered termination of reunification services for any siblings or half siblings of the child because the parent . . . failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent" (§ 361.5, subd. (b)(10)(A)), or "the parental rights of a parent over any sibling or

23

half sibling of the child had been permanently severed" (§ 361.5, subd. (b)(11)(A)); and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent" (§ 361.5, subds. (b)(10)(A) & (11)(A)).

"The 'reasonable effort[s]' necessary to avoid section 361.5, subdivision (b)(10) [or (b)(11)] bypass are not synonymous with ' "cure." ' [Citation.] They must, however, be more than ' "lackadaisical or half-hearted." ' [Citation.] Moreover, not every 'effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable. It is certainly appropriate for the juvenile court to consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made.' " (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121 (*Jennifer S.*); see also *id.* at pp. 1126–1127 ["[s]uch a severe impairment of parental rights should only be available where it is clear that parents continue to struggle with the issues that resulted in the loss of their previous children"].)

If the court finds a parent is described by section 361.5, subdivision (b)(10) or (11), the court "shall not order reunification for [the parent] . . . unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) "It is the parent's burden to prove that the

minor would benefit from the provision of court-ordered services."
(*Jennifer S., supra*, 15 Cal.App.5th at p. 1124.)

We review the juvenile court's order denying reunification services under section 361.5 for substantial evidence. (*Jennifer S., supra*, 15 Cal.App.5th at p. 1121; see also *O.B., supra*, 9 Cal.5th at pp. 1005, 1011 [under clear and convincing standard, substantial evidence must support finding to a high probability].) We review the juvenile court's best interest determination for abuse of discretion. (*Jennifer S.*, at pp. 1124–1125.)

b.    *The court properly applied section 361.5, subdivisions (b)(10) and (b)(11)*

DCFS argues mother's evidence did not demonstrate she had made reasonable efforts, noting she only recently had enrolled in counseling[10] and domestic violence classes and had not started her anger management course, though she registered for it on March 11, 2025.

Mother argues she presented evidence she had made reasonable efforts to treat the problems that led to the removal of S.P.'s half-siblings: the April 7, 2025 parenting progress letter stating she had "excellent test scores," a certification of completion for that parenting course of the same date, an April 9, 2025 letter from a licensed therapist confirming mother had

---

[10]    In addition to the parenting class, mother's December 6, 2024 case plan for the initial petition required her to participate in individual counseling "to address case issues to address underlying needs and healthy relationships" and to submit to three random and on-demand drug tests. Mother completed the parenting class as of April 7, 2025, but she didn't enroll in individual counseling until March 13 and she had missed all of her drug tests after her one negative test on October 21, 2024.

"initiated therapy service[s]" on March 13, 2025, and another April 7 letter confirming mother had enrolled and completed the intake process for a domestic violence education course on March 12 and stating "[s]ince her enrollment date," mother had "been an active participant in services." Mother contends the court thus erred in finding she had not made reasonable efforts to treat the problems that led to the removal of S.P.'s half-siblings. She asserts her "only jurisdictional transgression" in S.P.'s half-siblings' case was "her failure to protect the children from the G.D. father, who perpetrated violence against mother, suffered from mental problems, and had a substance abuse problem." Mother acknowledges the children were removed from her custody because she "allowed the G.D. father unmonitored access to at least one of the half-siblings," and her parental rights were terminated in August 2022 as a result. But she notes the domestic violence attributed to G.D. happened about seven years earlier.

Mother also argues the court improperly considered her lack of participation in domestic violence counseling as evidence she failed to demonstrate reasonable efforts because there was no evidence she was ordered to participate in domestic violence counseling in the half-siblings' cases. Mother's lack of participation in domestic violence counseling was but one factor the court considered. But even if it hadn't been ordered in the half-siblings' cases, certainly participation in counseling to recognize and address domestic violence issues would have been relevant to the problems that led to the half-siblings' removal.

In any event, while G.D. may have been the instigator of the violence against mother in the half-siblings' cases, she maintained a relationship with him and allowed him to have

access to the children.  She did the same thing here.  Mother allowed father—whom she knew was using illicit drugs, like G.D.—to have access to S.P. in violation of the court's order.  And, as the court noted, mother did so—and engaged in the violent altercation on December 20—despite the fact she was participating in a parenting course.  In short, rather than making reasonable efforts to correct the issues that led to the earlier loss of her reunification services and parental rights, mother—as the court found—continued to lack insight into those issues by engaging in the same type of behavior.  If anything, the evidence shows mother's conduct had escalated:  she resisted law enforcement while holding her baby; and, although father first tackled mother during the December 20 incident, she participated in the fight and had brought a knife with her.  Yet mother took no responsibility for her participation in the December 20 incident.  And, although her counsel argued at the jurisdiction hearing that mother had "no intention of reconciling with the father," she had maintained a relationship with him, as she apparently had with G.D.

Mother nevertheless contends the court improperly conflated the issues from the half-siblings' cases with those in S.P.'s case because she was not found to have been the perpetrator of the domestic violence in the earlier cases.  We do not agree that mother's failure to protect S.P.'s half-siblings from G.D.'s domestic violence is a distinct issue from mother's involvement in the domestic violence that led to S.P.'s removal.  The issues may not be identical, but they both involve violence and mother's lack of judgment as to what was in her children's best interest.

Relying on *Jennifer S., supra*, 15 Cal.App.5th 1113, mother also contends DCFS did not meet its burden to show a lack of reasonable services by clear and convincing evidence because it failed to present evidence from the half-siblings' case of the "dispositional reports and the reports upon which any terminations of services were based" or that the social worker had "thoroughly reviewed the prior records, interviewed the parents regarding past efforts, and [was] able to speak authoritatively as to why the parent at issue has failed to make reasonable efforts during the relevant timeframe." (Citing *Jennifer S.,* at p. 1126 ["to meet the burden to establish, by clear and convincing evidence, a lack of reasonable efforts . . . , child welfare workers must focus on the facts underlying the previous dependency action and its resolution, as well as on any efforts made by the parent *since the sibling removal*"].) But as that court also explained, "where substantial evidence supporting bypass is available, it would indeed be a tragedy to delay permanency for the dependent child at issue—the very reason these bypass provisions exist—simply because the relevant child welfare agency failed to do its job." (*Id.* at p. 1127.)

It's true the social worker didn't testify at the contested disposition hearing, and DCFS's *reports* from the half-siblings' cases do not appear to have been attached to the report in this case.[11] Nevertheless, the evidence before the juvenile court supported its finding, to a high probability, that mother's efforts

---

[11]  The court did, however, take judicial notice of the court file for the half-siblings' cases. DCFS also submitted minute orders from those cases that the court admitted into evidence by reference. They are part of the appellate record.

28

to resolve the issues that led to the removal of her children were not reasonable. Again, mother had completed a parenting class—yet engaged in the conduct leading to the removal of S.P. while in the class—and only just had begun to participate in individual counseling and domestic violence education. Mother had years since the half-siblings' removal to participate in these types of services. Indeed, the court had ordered mother to participate in individual counseling as early as February 2017 when it sustained the dependency petition as to J.D. and R.D. Yet, by 2019—when mother's reunification services as to S.P.'s half-siblings were terminated—the court had found her progress in her case plan "toward alleviating or mitigating the causes necessitating placement" had "not been substantial." That she then waited until March 2025 to *enroll* in individual counseling—despite the court having ordered her to do so in December 2024 as part of her case plan—further supports the court's finding that her efforts were not reasonable.

c.    *Mother failed to show reunification was in*
      *S.P.'s best interest*

Finally, the record does not compel us to conclude the juvenile court abused its discretion in finding it would not be in S.P.'s best interest to reunify with mother. (*Jennifer S., supra*, 15 Cal.App.5th at p. 1125.) "The concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' " (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) In determining whether reunification is in a child's best interest, courts have considered " 'the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child

29

bonds; and the child's need for stability and continuity.' " (*Jennifer S.,* at p. 1124; see also *Ethan N.*, at pp. 66–67.) "A best interest finding requires a likelihood reunification services will succeed; in other words, 'some "reasonable basis to conclude" that reunification is possible.' " (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1116.)

Mother argues that, as there was no possibility of expedited finality for S.P. because father was offered reunification services, S.P.'s stability was not an issue in bypassing her reunification services. She contends she had a significant relationship with S.P.—having cared for her for the first nine months of her life— and notes DCFS reported she was appropriate with S.P. during their visits and "able to maintain a positive bond."[12] Mother also argues her "part in the reason for the [half-siblings'] dependency proceeding was . . . not serious."

By the April 2025 hearing, S.P. was only 16 months old. Mother had cared for S.P. without incident for the first nine months of her life. Yet mother endangered S.P.—then nine months old—by resisting arrest while holding her. Mother then defied court orders and allowed father to have access to S.P. despite having lost custody of her other children for similar behavior. Mother also minimized the incident with father, which the court found to be "a very violent altercation," especially as mother had a knife. And mother's current efforts had been minimal. She did visit S.P. and acted appropriately with her, but her visits with S.P. were inconsistent—she was late to some,

---

[12] DCFS made that report *after* the court terminated mother's reunification services in a status review report filed May 20, 2025.

canceled others, and failed to show up to some visits without explanation.  She also fell asleep during a visit.  Mother's evidence does not compel a finding that reunification was in S.P.'s best interests.  The juvenile court reasonably could conclude reunification was unlikely given the circumstances of the current case and mother's past history.

## DISPOSITION

We affirm the court's March 11, 2025 order sustaining the section 342 petition, and the court's April 10, 2025 orders removing S.P. from mother and denying mother reunification services.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

HANASONO, J.